Helgi C. Walker
   (*pro hac vice* forthcoming)
Lucas C. Townsend
   (*pro hac vice* forthcoming)
Jeremy M. Christiansen (SBN 15110)
Andrew G. I. Kilberg
   (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  HWalker@gibsondunn.com
LTownsend@gibsondunn.com
JChristiansen@gibsondunn.com
AKilberg@gibsondunn.com

Michelle L. Rogers
   (*pro hac vice* forthcoming)
Veena Viswanatha
   (*pro hac vice* forthcoming)
Kathryn Goodman
   (*pro hac vice* forthcoming)
BUCKLEY LLP
1250 24th Street, N.W.
Suite 700
Washington, D.C.  20037
Phone:  (202) 349-8000
Fax:  (202) 349-8080
Email:  MRogers@buckleyfirm.com
VViswanatha@buckleyfirm.com
KGoodman@buckleyfirm.com

Michael Flynn
(*pro hac vice* forthcoming)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 346-4000
Fax: (202) 346-4444
Email:
Michaelflynn@goodwinlaw.com

*Attorneys for Plaintiffs Cedar Band of Paiutes, Cedar Band Corporation, and CBC Mortgage Agency*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CEDAR BAND OF PAIUTES; CEDAR BAND CORPORATION; and CBC MORTGAGE AGENCY;<br><br>                     Plaintiffs,<br>         v. | Case No. 4:19-cv-30-DN |

| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; FEDERAL HOUSING ADMINISTRATION; DR. BENJAMIN S. CARSON, SR., in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; and BRIAN D. MONTGOMERY, in his official capacity as Acting Deputy Secretary of Housing and Urban Development and Assistant Secretary of Housing and Urban Development for Housing – Federal Housing Commissioner;<br><br>Defendants. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>Judge David Nuffer |
| --- | --- |

Plaintiffs Cedar Band of Paiutes, Cedar Band Corporation, and CBC Mortgage Agency allege as follows:

## PRELIMINARY STATEMENT

1. This is a lawsuit to set aside a discriminatory and unlawful "Mortgagee Letter" issued without warning by the U.S. Department of Housing and Urban Development ("HUD") that has effectively destroyed Plaintiff CBC Mortgage Agency, an instrumentality of the federally recognized Cedar Band of Paiutes Indian American tribe, in one fell swoop. Although Mortgagee Letter 19-06 purports to be an informal "guidance" document that merely "clarifies" existing law governing the provision of downpayment assistance ("DPA") to homebuyers, it is in fact a radical shift in longstanding HUD policy that effectively outlaws CBC Mortgage Agency's business—thereby stripping the Cedar Band of a critical source of revenue needed to fund the Band's governmental functions.

2. For many years prior to the issuance of the Mortgagee Letter, HUD permitted tribal governments (as well as federal, state, and municipal governments) to serve as a source of DPA for homebuyers throughout the country. The Mortgagee Letter dramatically changes that policy. The Mortgagee Letter specifically and expressly targets American Indian tribes by requiring them, for the first time, to confine their DPA programs to the geographic boundaries of their reservations and to enrolled members of the tribes, literally driving them out of the national marketplace and back onto the reservation. It also changes the longstanding

definition of a Governmental Entity eligible to provide DPA to exclude the agencies and instrumentalities of American Indian tribes, thereby banning tribally chartered corporations like CBC Mortgage Agency from providing DPA under the provision of the Mortgagee Letter applicable to tribes. And it imposes new requirements on DPA providers that, like the CBC Mortgage Agency, provide DPA without originating first-lien purchase mortgage loans to borrowers.

3.      Within a day of release of the Mortgagee Letter, almost every lender that provides loans to borrowers in CBC Mortgage Agency's DPA program announced that it was suspending its business relationship with CBC Mortgage Agency, effectively immediately. The Mortgagee Letter had the immediate, irreparable effect of putting the CBC Mortgage Agency out of business—all without so much as a heads-up, let alone the Tribal Consultation required by law.

4.      The Mortgagee Letter inflicts irreparable harm not just on Plaintiffs but the many borrowers who rely on CBC Mortgage Agency to help them buy their home. The majority of such borrowers are African-Americans, Latinos, and other minorities, who often do not have the benefit of intergenerational wealth and savings as a source of down-payment funds. Prior to issuance of the Mortgagee Letter, CBC Mortgage Agency had achieved remarkable success on behalf of these borrowers: According to Moody's, loans secured with DPA from CBC Mortgage Agency outperform other Governmental Entity loans in that they have lower default rates, on average, thus representing a real benefit for traditionally underserved borrowers. Now, hundreds, if not thousands of buyers will be unable to close on the purchase

of their home and are otherwise adversely affected by increased costs, unrecoverable fees, and diminished options as a result of the sudden changes brought about by the Mortgagee Letter.

5.     Incredibly, the Mortgagee letter did all of this without providing *any* of the protections of the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, such as notice and the opportunity to comment.  Fundamental due process also requires fair warning before changing rules and policies on which regulated entities have come to rely, and federal agencies must provide reasoned explanations for their actions, which the Mortgagee Letter fails to do.  And Executive Branch policy requires HUD to consult with American Indian tribes before taking action that implicates tribal interests.  HUD did *none* of this—it issued the Mortgagee Letter without any forewarning, without any explanation, and without even acknowledging that it was completely redefining the market for government DPA programs to the detriment of American Indian tribes.  It is an egregious example of unlawful, arbitrary, and capricious action by a federal agency that must be held to account for its decision.

6.     As alleged in greater detail below, the Mortgagee Letter must be declared unlawful and set aside on numerous grounds.  It is a blatantly discriminatory attempt to force American Indians "back on the reservation" and deprive them of revenue needed for governmental purposes, in direct conflict with federal policy favoring greater economic self-sufficiency for Tribes.  This Court's immediate action is urgently needed to enjoin the Mortgagee Letter and restore the

status quo so that Plaintiffs, their members, and the borrowers who benefit from their program do not continue to suffer irreparable harm while this lawsuit is pending.

## PARTIES

7.     Plaintiff Cedar Band of Paiutes (the "Cedar Band") is a federally recognized American Indian tribe.  As a federally recognized tribe, the Cedar Band is generally considered a governmental entity under federal law.  The Cedar Band's reservation encompasses approximately 2,200 acres—roughly three and a half square miles—located near Cedar City, Utah 84721, a rural area in the southwestern portion of the state.  The location of the reservation provides few natural resources and limited economic opportunities for the tribe and its members.  The Cedar Band relies on income derived from Plaintiff Cedar Band Corporation to fund services for its members, including housing, education, and security.  If the Mortgagee Letter is not set aside, the Cedar Band will suffer a significant reduction in its revenue from Plaintiff Cedar Band Corporation and a corresponding negative impact on the services it provides to its members.

8.     Plaintiff Cedar Band Corporation ("CBC") is a tribal corporation chartered by the United States Department of the Interior ("DOI") under Section 17 of the Indian Reorganization Act, 25 U.S.C. § 5214.  *See* Ex. C (CBC Charter).  The Cedar Band is the sole shareholder of voting stock in CBC.  *See id.*, art. V.  Because CBC is an instrumentality of the Cedar Band, it is a governmental agency or instrumentality of the tribe and it enjoys sovereign immunity unless and until that immunity is waived.  *See id.* art. VIII.G.  CBC's principal place of business is located

5

at 600 North 100 East, Cedar City, Utah 84721. CBC's federal charter allows it to do business nationwide. *See, e.g.*, Ex. C, art. VII.F., art. VIII.A., art. VIII.D, art. VIII.P, art. VIII.S. If the Mortgagee Letter is not set aside, CBC will suffer a significant reduction in its revenue, which will prevent it from declaring dividends and making distributions to the Cedar Band.

9.       Plaintiff CBC Mortgage Agency ("CBCMA") is a tribal corporation chartered by CBC pursuant to the powers expressly authorized in CBC's federal charter. *See* Ex. D (CBCMA Charter); Ex. C, art. VIII.T. CBC is the sole shareholder of voting stock in CBCMA. *See* Ex. D, art. V. Because CBCMA is an instrumentality of the Cedar Band, it is a governmental agency or instrumentality of the tribe and it retains sovereign immunity unless and until that immunity is waived. *See, e.g. id.*, art. XV, § 15.02. CBCMA's principal place of business is located at 912 West Baxter Drive, Suite 150, South Jordan, Utah 84059.

10.       CBCMA is registered as a Governmental Mortgagee with HUD. Ex. B (Declaration of Michael Whipple), at ¶ 20 ("Whipple Decl."). Through its program, the Chenoa Fund, CBCMA provides DPA for mortgage loans insured by the Federal Housing Administration ("FHA") that are originated by other lenders, as well as a small number of conventional loans. CBCMA then purchases the first mortgages and sells them on a secondary market. *See id.* ¶¶ 10–11; *see also infra* ¶ 21. CBCMA's charter allows it to do business nationwide. *See, e.g.*, Ex. D, art. VII, § 7.01, art. VIII, §§ 8.19–8.20. The vast majority of loans for which CBCMA provides DPA are insured by the FHA. If the Mortgagee Letter is not set aside,

CBCMA's warehouse banks and investors will no longer work with CBCMA and CBCMA will go out of business.  *See* Whipple Decl. ¶¶ 27–35.[1]

11.     Defendant United States Department of Housing and Urban Development ("HUD") is an executive department of the United States.

12.     Defendant FHA is an agency within HUD.  It provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories, including thousands of loans originated in conjunction with DPA provided by CBCMA.  The FHA is the largest mortgage insurer in the world with an active insurance portfolio of over $1.3 trillion.

13.     Defendant Dr. Benjamin S. Carson, Sr. is the Secretary of HUD.  By law, Secretary Carson or his designee is directly responsible for HUD's FHA mortgage insurance program.  Specifically, he is authorized, "upon such terms as [he] may prescribe, to make commitments for the insuring of [eligible] mortgages prior to the date of their execution or disbursement thereon."  *See* 12 U.S.C. § 1709(a).  This authority has been delegated to the Assistant Secretary of HUD for Housing-Federal Housing Commissioner.

14.     Defendant Brian D. Montgomery is the Acting Deputy Secretary of Housing and Urban Development and the Assistant Secretary of HUD for Housing – Federal Housing Commissioner.  In that capacity, Assistant Secretary Montgomery is responsible for HUD's FHA mortgage insurance program and the rules,

---

[1] Plaintiffs incorporate the Whipple Declaration, in addition to all exhibits attached hereto, as if fully set out herein.

regulations, and policies relating to that program. *See id.* Assistant Secretary Montgomery signed the Mortgagee Letter. *See* Ex. A, at 7.

## JURISDICTION AND VENUE

15.     This action arises under the United States Constitution, the APA, 5 U.S.C. § 500 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201, and Section 203 of the National Housing Act ("NHA"), 12 U.S.C. § 1709.  The Mortgagee Letter is "final agency action" subject to review under the APA.  5 U.S.C. § 704. Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

16.     Sovereign immunity has been waived under 5 U.S.C. § 702.

17.     Venue is proper in this district under 28 U.S.C. § 1391(e) because this is an action against officers and an agency of the United States, and Plaintiffs reside in this judicial district and no real property is involved in this action.  Venue is also proper in the Central Division because CBCMA resides in this division.

## BACKGROUND

### I.     <u>Downpayment Assistance Facilitates Homeownership</u>.

18.     The FHA insures loans made by FHA-approved lenders nationwide. FHA-insured loans generally require a smaller downpayment and a lower minimum credit score.  These loans therefore are often a path to homeownership for lower income borrowers.  FHA lending opens the door to homeownership for millions of Americans who otherwise could have difficulty obtaining an affordable mortgage because FHA insurance incentivizes lenders to make loans that may be viewed as

carrying more credit risk.  Nevertheless, many Americans find it difficult to save the funds necessary to make the minimum downpayment to qualify for an FHA-insured loan and cannot obtain the necessary money from family members.

19.    This is particularly true for minority borrowers, who often do not have the benefit of relying on intergenerational wealth and gifts from family members as a source of savings, and thus downpayment funds.  In 2010, HUD noted that "Down payment costs - including closing costs - remain the most significant barrier to homeownership, especially for low- to moderate-income households."   U.S. Department of Housing and Urban Development, Barriers to Minority Homeownership,  Apr.  9,  2010,  *available  at*  https://archives.hud.gov /reports/barriers.cfm (Ex. J-1).  *See also* Marvin M. Smith, *Spotlight on Research: Down Payment Assistance Plays Critical Role in Affordable Homeownership*, Fed. Reserve  Bank  of  Phila.,  91  Cascade  (2016),  *available  at* https://www.philadelphiafed.org/community-development/publications/cascade/ 91/04_spotlight-on-research (summarizing study underscoring the importance of down payment assistance, in particular for minority homeownership) (Ex. J-2); Worland, Justin, Minorities Face Significant Barriers to Home Ownership in the U.S., Report Says, Time, Feb. 9, 2015, *available at* http://time.com/3700741/black- hispanic-mortgage-disparity/ (noting that, even in 2015, minorities continued to face significant barriers to homeownership) (Ex. J-3).  Indeed, a 2010 study found that liquid financial assets are statistically significant predictors of homeownership and that "[DPA] programs . . . can have a significant impact on the number of low-

income and minority households that buy homes." Herbert, Christopher and Tsen, Winnie, *The Potential of Downpayment Assistance for Increasing Homeownership Among Minority and Low-Income Households*, CITYSCAPE: A JOURNAL OF POLICY DEVELOPMENT AND RESEARCH, Vol. 9, No. 2, Nov. 2, 2007, *available at* https://www.huduser.gov/portal/periodicals/cityscpe/vol9num2/ch5.pdf (Ex. J-4).

20.    HUD's longstanding policy has been to allow governmental entities, including tribal entities, to provide DPA.  Until the Mortgagee Letter, HUD did not limit tribes' provision of DPA to borrowers on the tribes' reservations or to tribal members.

21.    CBCMA, like many other DPA providers, provides DPA to borrowers in the form of second mortgages.  Different mortgage lenders originate the mortgage loan to a qualifying borrower.  As part of that transaction, CBCMA provides the funds for the downpayment in the form of a second mortgage that is originated on the property.  The second mortgage is subordinate to the first mortgage; in case of default, the first mortgage must be satisfied through the proceeds from the sale of the collateral before satisfaction of the second mortgage.  As part of the arrangement, CBCMA acquires both the first and second mortgages from the lender.  It sells the first mortgage on the secondary market, but retains the second mortgage and maintains contact with the borrower during the first year of homeownership to provide support and counseling, advising borrowers on issues ranging from where to send payments to how to maintain a budget.  The second mortgage may or may not need to be repaid depending on whether the borrower meets certain standards.

22.    CBCMA provides much-needed downpayment funds to historically underserved minority communities, including African American, Hispanic, and Latino borrowers.  Based on recent figures, these communities represent nearly 54% of the borrowers who obtain DPA from CBCMA.  *See* Whipple Decl. ¶ 7.  By contrast, in 2017, minorities made up less than 20% of borrowers who obtained a home purchase mortgage loan insured or guaranteed by FHA, FSA/Rural Housing Service, or the Department of Veterans Affairs.  *See* Federal Financial Institutions Examination Council, National Aggregate Reports, 2017, Table 4-1: Disposition of applications for FHA, FSA/RHS, and VA home-purchase loans, 1-4 family and manufactured home dwellings, by race, ethnicity, gender and income of applicant, *available at* https://ffiec.cfpb.gov/data-publication/national-aggregate-reports/2017/4-1 (Ex. J-5).[2]

23.    CBCMA is one of the only tribal entities in the United States currently providing DPA to borrowers off the reservation and to non-members.

## II.    HUD Outlaws The Vast Majority Of DPA Provided By Tribal Entities.

24.    Section 203 of the NHA, 12 U.S.C. § 1709, governs FHA insurance. Before October 1, 2008, Section 203 required that, to qualify for FHA insurance, a homebuyer must provide a downpayment of at least 3% of estimated cost of acquisition.   Section 203 did not discuss DPA other than to state that the

---

[2] CBCMA also provides a small number of conventional loans that are not FHA-insured.

downpayment—sometimes called a minimum required investment ("MRI")—could be sourced from family members. *See* 12 U.S.C. § 1709(b)(9) (2007). HUD allowed DPA to be provided by governmental entities.

25. In 2007, HUD published a final rule signed by Assistant Secretary Montgomery, who held the same position then that he does now, prohibiting "sellers from funding downpayments in their own home sales transactions" through an arrangement where "a so-called charitable organization provides a so-called gift to a homebuyer from funds that it receives, directly or indirectly, from the seller." *Standards for Mortgagor's Investment in Mortgaged Property*, 72 Fed. Reg. 56002, 56002–03 (Oct. 1, 2007) (the "2007 Rule"). HUD was concerned that this practice led to "home price inflation and the associated risks for increased delinquency and foreclosure" and, as a result, burdens on the FHA, which "cannot recover the full amount owed." *Id.* at 56003.

26. The 2007 Rule did not prohibit the provision of DPA by governmental entities. On the contrary, it expressly provided that DPA "is permitted . . . from . . . governments." *Id.* The 2007 Rule also specifically provided "that a tribal government . . . is a permissible source of downpayment assistance." *Id.*; *see also* 24 C.F.R. § 203.19(f) (2008) (permitting DPA from "[a] tribal government or an agency or instrumentality thereof").

27. In 2008, two separate district courts held that the 2007 Rule's prohibition of seller-funded DPA violated the APA and ordered it vacated. One court held that HUD did not acknowledge it was changing its position on seller-

funded DPA and did not adequately respond to certain public comments. *Nehemiah Corp. of Am. v. Jackson*, 546 F. Supp. 2d 830 (E.D. Cal. 2008). The other held that HUD impermissibly relied on a loan analysis that had been disclosed for the first time in the final rule and that the sources upon which HUD could permissibly rely did not support HUD's rationale. *Penobscot Indian Nation v. HUD*, 539 F. Supp. 2d 40 (D.D.C. 2008). One of the courts also disqualified the then-HUD Secretary from participating in proceedings on remand because he had prejudged the issues. *See Nehemiah Corp.*, 546 F. Supp. 2d at 847–49. No court addressed the question whether a tribal governmental entity is a permissible source of DPA. In a subsequent settlement of the *Penobscot* litigation, HUD was made aware that the Penobscot were operating nationwide, and HUD acknowledged that the Tribe could lawfully provide DPA. *Penobscot Indian Nation v. HUD*, No. 07-1282, Dkt. 43, at 2 (D.D.C. Apr. 3, 2008). The *Penobscot* settlement thus endorsed that the Tribe was acting in a governmental capacity, even when it was providing DPA on a nationwide basis.

28.    Congress responded later that year in the Housing and Economic Recovery Act of 2008, Pub. L. 110-289, 122 Stat. 2654, 2831–32 ("HERA"). Section 203(b)(9)(A) now requires that, to qualify for FHA insurance, a homebuyer must provide as a downpayment at least 3.5% of the appraised value of the property. Under Section 203(b)(9)(C), the 3.5% MRI cannot "consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:  (i) The seller or any other person or entity that financially benefits from the transaction.  (ii) Any third party or entity that is reimbursed, directly or

13

indirectly, by any of the parties described in clause (i)."  HERA did not say anything about DPA provided by governmental entities.

29.      In 2012, HUD addressed the legality of DPA provided by governmental entities under Section 203(b)(9)(C), as amended by HERA.  In an interpretive rule published in the Federal Register, HUD stated:  "It is HUD's interpretation that section 203(b)(9)(C) of the NHA does not prohibit FHA from insuring mortgages originated as part of the homeownership programs of Federal, State, or local governments or their agencies or instrumentalities when such agencies or instrumentalities also directly provide funds toward the required minimum cash investment."  *Federal Housing Administration: Prohibited Sources of Minimum Cash Investment Under the National Housing Act—Interpretive Rule*, 77 Fed. Reg. 72219, 72222 (Dec. 5, 2012).  HUD thus continued its longstanding policy of allowing governmental entities, including tribal entities, to provide DPA.

30.      Current HUD policy, as set forth in HUD Handbook 4000.1 (Mar. 27, 2019), *available at* https://www.hud.gov/sites/dfiles/SFH/documents/sfh_hb _4000_1.pdf, allows "Governmental Entities" to provide DPA in connection with originating a first mortgage (II.A.4.d.ii.(B), p. 225–26), as a gift (II.A.4.d.iii.(F).(2).(a), p. 229–30) and as secondary financing (II.A.4.d.iii.(J).(1), p. 235–36).  The HUD Handbook defines "Governmental Entity" as "any federal, state, or local government agency or instrumentality."  II.A.4.iii.(J).(1).(a), p. 234; *see also* HUD Handbook 4000.1 Glossary at 13, *available at* https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsghglossary.pdf.  An

instrumentality "must be established by a governmental body or with governmental approval or under special law to serve a particular public purpose or designated by law (statute or court opinion) and does not have 501(c)(3) status."  HUD Handbook 4000.1, at II.A.4.iii.(J).(1).(a), p. 234; *see also* HUD Handbook 4000.1 Glossary at 13.

31.  In 2013, HUD approved CBCMA as a Governmental Mortgagee.  A "Governmental Mortgagee" is "a federal, state, or municipal governmental agency, a Federal Reserve Bank, a Federal Home Loan Bank, the Federal Home Loan Mortgage Corporation (FHLMC, or Freddie Mac), or the Federal National Mortgage Association (FNMA, or Fannie Mae)."  HUD Handbook 4000.1 Glossary at 13. Therefore, CBCMA's approval as a Governmental Mortgagee recognizes that CBCMA is a Governmental Entity.

32.  CBCMA provided the CBC and CBCMA charters to HUD during this process.  *See* Ex. E (e-mail from CBCMA to HUD, dated Nov. 14, 2013).  HUD therefore knew that CBCMA would be providing DPA nationwide, not just on the reservation or to tribal members.  *See, e.g.*, Ex. D, at art. VII, § 7.01, art. VIII, §§ 8.19–8.20.  Similarly, HUD has insured loan packages that include CBCMA's DPA for years.  Under 12 U.S.C. § 1709(e), that is "conclusive evidence of the eligibility of the loan or mortgage for insurance."  HUD thus has accepted that CBCMA is a Governmental Entity that may lawfully provide DPA nationwide.

33.  However, beginning in 2016, HUD began to hint that it had predetermined to drastically limit the ability of tribal entities to provide DPA.  In

December 2016, one of CBCMA's correspondent lenders, Amerifirst Financial, Inc., received a notice from HUD stating that CBCMA "does not appear to be a Government Entity," an assertion that Amerifirst moved quickly to correct by sending a letter to HUD explaining that CBCMA is an instrumentality of the Cedar Band.  *See* Ex. F (correspondence between HUD and Amerifirst).

34.    In May 2017, an FAQ on HUD's Knowledgebase was updated and indicated that tribes could only provide assistance to their members.  The FAQ, which was brought to CBCMA's attention by a third party, was removed soon after a representative from the National American Indian Housing Council (an association that advocates on behalf of tribes and tribal housing authorities) contacted HUD asking about the FAQ.  *See* Ex. G.

35.    In August 2017, Esther Yamashiro, Mortgage Credit Branch Chief for the FHA's Santa Ana Homeownership Center, spoke at an FHA underwriter training event in Phoenix, Arizona.  Yamashiro and another HUD official at the event asserted that CBCMA was not authorized to provide DPA.  After the event, CBCMA sent a letter to Thomas A. Rose, the Director of the Santa Ana Homeownership Center objecting to the statements made at the event.  In a letter responding to CBCMA, Director Rose stated that the rules in HUD's handbooks "and applicable laws and regulations" applied.  *See* Ex. H.

36.    CBCMA made several attempts between 2017 and early 2019 to meet with HUD representatives in order to understand HUD's concerns and to clarify the nature of their program.  Other than one, brief meeting on March 1, 2018, during

which representatives made no reference to any forthcoming action, HUD has been unwilling to engage with CBCMA.  Assistant Secretary Montgomery has refused to meet with CBCMA representatives entirely.  HUD also unilaterally cancelled a second meeting with CBCMA representatives that had been scheduled for October 30, 2018. *See* Whipple Decl. ¶ 25.

37.    In spring 2018, the Unified Agenda of Regulatory and Deregulatory Actions, which is issued bi-annually by the Office of Information and Regulatory Affairs ("OIRA"), part of the Office of Management and Budget ("OMB"), noted that HUD was drafting an advanced notice of proposed rulemaking ("ANPRM") that would "seek comment on the ***use of downpayment assistance from*** a source other than a family member, including from ***tribal providers, state housing finance agencies, local housing finance agencies, entities acting in a governmental capacity*** and non-profit organizations in satisfying the statutorily required minimum investment and as a source of any additional funds needed to close the insured mortgage transaction."    Spring 2018 Unified Agenda of Regulatory and Deregulatory Actions, Office of Mgmt. & Budget, RIN No. 2502-AJ44, *available at* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201804&RIN=2502 -AJ44 (emphasis added) (Ex. J-6).  To date, no ANPRM has been published.

38.    In fall 2018, OIRA's Unified Agenda again noted that HUD was drafting an ANPRM.  This time, the ANPRM would seek comment on "the source of the borrower's [MRI], including sources other than the borrower or the borrower's family members, ***e.g., downpayment assistance (DPA) or secondary financing***

17

*from governmental entities* and nonprofit organizations." Fall 2018 Unified Agenda of Regulatory and Deregulatory Actions, Office of Mgmt. & Budget, RIN No. 2502-AJ44, *available at* https://www.reginfo.gov/public/do/eAgenda ViewRule?pubId=201810&RIN=2502-AJ44 (emphasis added) (Ex. J-7). To date, no ANPRM has been published.

39. On March 27, 2019, President Trump issued a memorandum to Secretary Carson, other heads of cabinet departments, and other domestic policy officials that, among other things, "directed [Secretary Carson] to develop a plan for administrative and legislative reforms," including the FHA. Memorandum on Federal Housing Finance Reform § 2, *available at* https://www.whitehouse.gov/presidential-actions/memorandum-federal-housing-finance-reform/ (Ex. J-8). The President instructed Secretary Carson to "consult with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Veterans Affairs, the Director of the Office of Management and Budget, the Director of the Bureau of Consumer Financial Protection, the Assistant to the President for Economic Policy, and the Assistant to the President for Domestic Policy." *Id.* § 2(d). The President directed that "[t]he HUD Reform Plan shall be submitted to the President for approval, through the Assistant to the President for Economic Policy, as soon as practicable." *Id.* § 2(e).

40. On April 11, 2019, the Acting Director of OMB sent a memorandum to the heads of all executive agencies announcing that, effective May 11, 2019, all agencies will be required to submit all regulatory guidance materials that qualify as

18

"rules" under the Congressional Review Act to OIRA for review prior to publication. Office of Mgmt. & Budget, Exec. Office of the President, M-19-14 (Apr. 11, 2019).

41.    On April 18, 2019, one day before the beginning of Passover and the weekend of Easter, HUD issued Mortgagee Letter 19-06 without prior notice, without soliciting comment, without engaging in tribal consultation, without submitting it to OIRA, without consulting with the officials listed in the President's Memorandum on Federal Housing Finance Reform, and without submitting a Reform Plan to the President for approval.

42.    The Mortgagee Letter purports "to ***clarify*** documentation requirements that FHA-approved Mortgagees must satisfy when originating a mortgage for a Borrower using funds from another person or entity to satisfy a portion or all of the Minimum Required Investment (MRI), including specific documentation that adequately demonstrates the existing requirement that Governmental Entities are operating in their governmental capacity when providing downpayment assistance pursuant to the December 5, 2012 Interpretive Rule." Ex. A, at 1 (emphasis added). In reality, the Mortgagee Letter introduces, for the first time ever, a requirement that the insured property is located within the borders of the government of which the entity is an agency or instrumentality or, in the case of American Indian tribes, is being purchased by a member of the tribe in question. *Id.* at 5.

43.    Moreover, the Mortgagee Letter broadens the special requirements for Governmental Entities, which used to hinge on whether "the Governmental Entity ***is originating*** the insured Mortgage through one of its homeownership programs,"

HUD Handbook 4000.1 at 225 (emphasis added), to now apply "where the Mortgage *is being originated* as part of a Governmental Entity homeownership program," Ex. A, at 4 (emphasis added).

44.   The Mortgagee Letter also states that "the provision of [DPA]" cannot be "contingent upon any future transfer of the insured Mortgage to a specific entity." Ex. A, at 5.  In a stroke, HUD has prohibited the model used by many, if not the vast majority, of governmental entities that provide DPA.  These governmental entities use the profits from the sale or securitization of the first mortgage to fund their programs. If the governmental entity can no longer require that the first mortgage be sold to the governmental entity, if loses a significant source of funding for its program.  HUD examined this practice just a few years ago and found it lawful.  *See* Ex. I (HUD decision on NOVA Financial & Investment Corp. audit).

45.   In addition, the Mortgagee Letter establishes burdensome new documentation requirements:

a.   Governmental entities must provide to mortgagees "a legal opinion signed and dated within two years of closing of the transaction by attorneys for the Governmental Entity stating" that "the attorney has reviewed the Governmental Entity's downpayment assistance program" and is operating within its "jurisdiction," which for American Indian tribes means that "the Governmental Entity is a federal recognized Indian Tribe operating on tribal land in which the Property is located or to enrolled members of the tribe." *Id.*  Governmental Entities may include agencies and instrumentalities

20

if they are federal, state, or municipal entities, but the provision of the Mortgagee Letter applicable to tribes does not reference agencies or instrumentalities of a tribe.

      b.     Governmental entities must provide to mortgagees a signed letter that establishes that the DPA was provided with respect to a property within its jurisdiction, as defined above. *Id.*

46.    The Mortgagee Letter purports to be "effective for case numbers assigned on or after April 18, 2019." *Id.* at 1.

47.    The Mortgagee Letter contains only two paragraphs of "[b]ackground." *Id.* at 2.  Nothing in those paragraphs, or anywhere else in the Mortgagee Letter, constitutes reasoned explanation.  The sum total of HUD's rationale for the Mortgagee Letter consists of two sentences:  "It has come to FHA's attention that certain Governmental Entities may be acting beyond the scope of any inherent or granted governmental authority in providing funds towards the Borrower's MRI in circumstances that would violate Handbook 4000.1, the National Housing Act, and is contrary to established law.  In reviewing its current documentation requirements for Mortgagees, FHA has determined that those requirements should be clarified to provide Mortgagees with specific guidance regarding documentation that will give greater assurances that the standards for providing the MRI have been satisfied by the Governmental Entity." *Id.*

### III.   The Mortgagee Letter Destroyed CBCMA's Business Literally Overnight, Irreparably Harming CBC And The Cedar Band.

48.   The Mortgagee Letter "threatens the very existence of [CBCMA's] business," *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016), and is causing and will soon result in "a complete or substantial loss of [CBCMA's] business during the pendency of the trial unless the injunction issues." *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (granting injunction).  That is clear-cut irreparable injury.

49.   The Mortgagee Letter on its face purports to prohibit CBCMA from: (1) operating anywhere but on its roughly 2,200-acre reservation; or (2) serving anyone but one of its enrolled members.  Whipple Decl. ¶ 27; *see also id.* Ex. A, at 5.  The devastating impact of these unlawful restrictions is self-evident for a company that operates nationwide and has provided lawful DPA to more than 14,000 loans to persons on an equal-opportunity basis, irrespective of race, national origin, religion, tribal affiliation, sex, sexual orientation, etc.  Whipple Decl. ¶¶ 9, 29–35.  CBCMA reasonably relied on the previous policy, which allowed it to operate nationwide and without limitation to tribal members, and on HUD's approval of it as a Government Mortgagee.  *See id.* ¶ 19–21; *supra* ¶¶ 10, 24–32.

50.   Before the end of the day the Mortgagee Letter was issued, many loan providers or other business partners contacted CBCMA to either express concern about future business and/or to ***entirely withdraw any future business***.  Whipple Decl. ¶¶ 31.

22

51.     The impact of this Mortgagee Letter has been devastating to CBCMA, and will soon prove entirely ruinous if injunctive relief does not issue from this Court.  Literally hour by hour, CBCMA's business is dying, as more and more lenders directly cite the Mortgagee Letter as the reason they must suspend business with CBCMA.  Whipple Decl. ¶¶ 30–33.  By the close of business on Friday, April 19, 2019, ***almost every lender had suspended doing business with CBCMA***, meaning no new loans are being generated that rely on CBCMA's DPA.  Whipple Decl. ¶ 33.  That spells the end of CBCMA.

52.     The stakes could not be higher for Plaintiffs, as the Mortgagee Letter is swiftly bringing about the demise of CBCMA, thus visiting additional harms on CBC, the Cedar Band, and Cedar Band members.  The profits from CBCMA's DPA operations that are not reinvested flow up to the Cedar Band and are a substantial source of income for CBC and the Cedar Band.  One hundred percent of CBC's distributions go to the Cedar Band.  Whipple Decl. ¶ 15.  Money from CBCMA is used for sustaining essential government functions, preserving and promoting tribal culture, and ensuring long-term viability and support for the members of the Band. *See id.* ¶¶ 16–19.  For instance, revenues support:

     a.     Youth Programs:  The Band provides a range of after-school programs, assisting students through tutoring and the opportunity to complete homework in a structured and supportive environment.

     b.     Scholarship Program:  The Cedar Band of Paiutes Scholarship is available to enrolled Band members who are pursuing a higher education.

Scholarships are granted on the basis of academic achievement and/or financial need.

c.      Elder Assistance Programs:  The Cedar Band cherishes its elder members and considers them a living thread to its past.  To help maintain and preserve cultural values and traditions, the Band puts a focus on elders and supports them through special activities.  Targeted efforts also are made to improve the quality of life for Band elders and foster their independence.  Specifically, revenues are used to fund supportive services such as transportation, as well as a small monthly stipend to each band member over the age of 62.

d.      Southern Paiute Language Study and Research:  As part of its cultural preservation efforts, the Band offers members the opportunity to learn the Paiute language in classes provided twice each week.  In addition to learning to speak Paiute, students can further their skills and knowledge of Paiute history and traditions by engaging in guided research and writing projects.

e.      Cultural Opportunities:  The Band's leaders are dedicated to sustaining and expanding awareness of important historical and cultural customs.  Toward that goal, the Band periodically funds culturally significant opportunities, such as Spirit runs and hunting camps where youth can learn to hunt and field dress.

f.      Cedar Band Building Renovation and Maintenance:  The Band recently renovated its headquarters building in Cedar City, including upgrades to the kitchen, the bathrooms and classrooms, offices, and landscaping. Remodeling efforts, including reroofing, are ongoing.  Revenues also finance ongoing building maintenance.

g.      Work Training:  A key element of the Band's ongoing economic development efforts is providing work opportunities and training to its members, particularly youth.  The Work Training Program is designed to offer hands-on job opportunities and education.  Participants in the Work Training Program provided substantial assistance in the recent renovation of the Band's headquarters.  They also perform building maintenance and landscaping.

h.      New Travel Plaza:  Thanks to ongoing revenues, the Band plans to break ground on a new enterprise that combines a gas station, travel plaza, and convenience store, without the need for long-term debt.  The complex, scheduled for completion in January 2020, will provide additional jobs and income opportunities for members of the Band.

53.    Even the "threatened loss of prospective customers," amounts to irreparable injury.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (emphasis added).  There is little doubt that potential *new* borrowers or lenders will simply never come to CBCMA in the first place because of the impact of the Mortgagee Letter if the Letter is not put on pause in the meantime.  Whipple Decl. ¶ 34.

25

54.    The Mortgagee Letter also severely harms CBCMA's hard-earned goodwill, a classic form of irreparable injury.  Whipple Decl. ¶¶ 34.  Both CBCMA's official charter from the tribe permits it to carry out its operations as it always has **and** HUD itself approved CBCMA as a Government Mortgagee some 5.5 years ago. *See supra* ¶¶ 9–10, 31.   But in a startling about-face, Defendants issued the Mortgagee Letter maligning CBCMA as "acting beyond the scope of any inherent or granted governmental authority," and "contrary to established law."  Ex. A, at 2. That imposes "incalculable damage to [Plaintiffs'] goodwill" and is "irreparable harm."  *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1192 (10th Cir. 2009). Regaining trust once Defendants have all but declared CBCMA's DPA program unlawful will be extremely challenging, if not impossible.  Whipple Decl. ¶¶ 34.

55.    The Mortgagee Letter is unconstitutional and the injuries it visits on Plaintiffs are of constitutional magnitude.  "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001), *abrogated in part on other grounds by O Centro Espitira Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2019); *see also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.); *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).  Defendants' actions violate Plaintiffs' due process rights, as well as their rights under the Takings Clause.  *See infra* ¶¶ 72– 73.  The Mortgagee Letter's continued existence is visiting ongoing constitutional harm to Plaintiffs, and that harm is by definition irreparable.

26

56.     Many of CBCMA's borrowers and those of other DPA providers also are immediately and irreparably harmed.  Many individuals who have not yet closed on their new homes are in a particularly precarious situation, because their lenders cannot close on the transaction until they have provided the documentation required by the Mortgagee Letter.  Many individuals face losing their earnest money deposit and the heartache and headache of watching homeownership slip out of their fingers. More troubling, many may also become temporarily homeless.  CBCMA has been told that, because of the Mortgagee Letter, several borrowers, who already paid fees, entered into purchase contracts, and deposited earnest money, are already now without a DPA provider.  *See* Whipple Decl. ¶¶ 37–44.

## IV.    **HUD's Failure To Provide Notice And Comment Of Its Policy Change Violated The APA And Its Enabling Statute.**

57.     Under the APA, agencies must publish a notice of proposed rulemaking in the Federal Register and allow the public an opportunity for meaningful comment. 5 U.S.C. § 553(b)–(c).  HUD violated the APA by not publishing a notice of its proposal to change its policies regarding the provision of DPA by tribal entities and by not allowing a period for public comment on the change.  *See* 5 U.S.C. § 706(2)(A), (C)–(D).

58.     The Mortgagee Letter constitutes a legislative rule, because it has the force and effect of law.  Such rules can only be promulgated through notice-and-comment rulemaking.   Curtailing tribes' ability to provide DPA "effects a substantive regulatory change" by altering tribes' legal rights.  *Mendoza v. Perez*,

754 F.3d 1002, 1021 (D.C. Cir. 2014). The Mortgagee Letter, irrespective of its nominal packaging, "upset . . . settled legal expectations," *Ballesteros v. Ashcroft*, 452 F.3d 1153, 1159 (10th Cir. 2006), and "create[d] . . . new duties" in providing DPA, *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1223 (10th Cir. 2009). These are the hallmarks of a substantive, legislative rule, which must go through notice-and-comment procedures under the APA. "HUD is not free to ignore the requirements of the APA in its haste to address perceived problems in the realm of national housing policy." *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997).

59.   Conversely, the Mortgagee Letter is not a mere statement of policy or interpretive rule—there is nothing in need of interpretation and the Mortgagee Letter does not interpret a statute. Nothing in the statutory scheme suggests geographical or ethnicity-based limitations on DPA. *See infra* ¶¶ 76–83. Any change in HUD's longstanding position could not be characterized as "simply clarify[ing] or explain[ing]" the already-existing state of the law or merely "remind[ing] parties of existing statutory . . . duties." *Mendoza*, 754 F.3d at 1021.

60.   Notice-and-comment procedures also should have been used because the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). HUD used notice-and-comment rulemaking when it issued its 2007 Final Rule, which attempted to establish the metes and bounds of permissible DPA, including tribes' ability to offer DPA. HUD

thus was required to proceed through notice and comment here, regardless of whether the Mortgagee Letter is properly characterized as substantive or interpretive.

61.    If there were any doubt about the need for notice-and-comment rulemaking, it must be resolved in favor of such procedures in this context.  The Supreme Court has a "stated preference for rulemaking."  *De Niz Robles v. Lynch*, 803 F.3d 1165, 1173 (10th Cir. 2015) (Gorsuch, J.).    Notice-and-comment rulemaking is better equipped to deal with significance reliance interests by "offer[ing] more notice (due process) and better protect[ing] against invidious discrimination (equal protection)."  *Id.*  Both significant reliance interests, *see supra* ¶¶ 10, 24–34, 49, and the specter of racial discrimination, *see infra* ¶¶ 90–92, are present here.  Ultimately, the "function of filling in the interstices of [federal statutes]"—to the extent there are any to be filled—should be performed, as much as possible, through" rulemaking.  *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947).

62.    HUD also has an express, codified policy "to provide for public participation in rulemaking with respect to ***all HUD programs and functions***."  24 C.F.R. § 10.1 (emphasis added).   Courts have chastised HUD in the past for attempting to circumvent this important policy.  *Patriot, Inc.*, 963 F. Supp. at 5; *Hous. Study Grp. v. Kemp*, 739 F. Supp. 633, 636 n.9 (D.D.C. 1990) (*Kemp III*); *Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 325 n.3, 329 (D.D.C. 1990) (*Kemp II*); *Hous. Study Grp. v. Kemp*, 732 F. Supp. 180, 186 (D.D.C. 1990) (*Kemp I*).  "It is axiomatic . . . that an agency is bound by its own regulations," and "an agency action

may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotation marks omitted).

63.     Furthermore, HUD's enabling statute requires it to provide Congress with notice of the rule before it is published for comment in the Federal Register.  42 U.S.C. § 3535(*o*).  Failure to comply with these "layover and wait" provisions is an additional ground for invalidation.  *Kemp II*, 736 F. Supp. at 325 n.4, 329 n.13; *Kemp I*, 732 F. Supp. at 186.

64.     HUD's own actions confirm that the agency knew it had an obligation to provide notice and seek comment on the policy changes made in the Mortgagee Letter.  In both of the OIRA Unified Agendas issued in 2018, HUD represented that it was drafting an ANPRM that would seek comment on the provision of DPA by governmental entities, including tribes.  Yet HUD never published an ANPRM and did not proceed with a notice and comment rulemaking.  Instead, HUD chose to regulate by ambush, releasing the Mortgagee Letter on the eve of two major religious holidays without any notice to, or meaningful consultation with, affected entities.

## V.     The Mortgagee Letter Is Arbitrary And Capricious Because HUD Failed To Meaningfully Consult With CBCMA.

65.     HUD's Tribal Consultation Policy affirmatively requires that HUD consult "with individual tribes" "to the greatest extent practicable" (i) when it drafts a policy that will have "tribal implications," and again (ii) before it adopts such a policy.  *Tribal Government-to-Government Consultation Policy*, 81 Fed. Reg.

40893, 40896 (June 23, 2016). "*Policies that have tribal implications*" are those "regulations, legislative proposals, [or] other policy statements or actions that have substantial direct effects on one or more Indian tribe[s]." *Id.* at 40895. "'*Consultation*' means the *direct* and *interactive* (*i.e.*, collaborative) involvement of tribes in the development of regulatory policies on matters that have tribal implications." *Id.*

66.    As described above, the Mortgagee Letter is already destroying the business of a tribal entity, CBCMA, which will have significant downstream effects on CBC and, ultimately, the Cedar Band. *See supra* ¶¶ 48–54.

67.    HUD also acted with specific intent to target tribes and CBCMA. Through its actions and public statements, HUD has made clear that it is targeting CBCMA's ability to provide DPA outside of reservation lands and to non-members. There are multiple examples of such targeting, each of which squarely implicates HUD's Tribal Consultation Policy. *See supra* ¶¶ 33–38.

68.    Because HUD formulated new "proposed policies," and those policies would have a direct—indeed, an intentional—effect on CBCMA, HUD was required to consult with the Cedar Band "*before such policies are drafted*," and to follow the applicable notice and comment procedures contained in the Tribal Consultation Policy. 81 Fed. Reg. at 40896 (emphasis added). Moreover, if and when any such policy has been drafted, HUD must engage in *further consultation* before adopting that policy, including providing for notice and comment opportunities. *Id.*

69.     Although HUD provided for one meeting with CBCMA in early 2018, during which no mention was made of potential forthcoming action, that meeting was far from "interactive" and, regardless, HUD completely failed to follow the rest of the procedures required under the Tribal Consultation Policy.  HUD's open disregard for its own regulations is arbitrary and capricious and renders the Mortgagee Letter invalid.  *See* 5 U.S.C. § 706(2)(A), (D).

## VI.    **The Mortgagee Letter's Lack Of Explanation Violates The APA.**

70.     As noted above, the Mortgagee Letter contains essentially no explanation for the change in policy it institutes.  Indeed, the Mortgagee Letter does not even acknowledge that it is changing policy or the significant reliance interests at stake.

71.     Accordingly, the Mortgagee Letter violates the APA's requirement that agencies provide a reasoned explanation for their actions in three ways:

a.     First, HUD failed to provide *any reasoned explanation whatsoever* for the Mortgagee Letter.  It stated "that certain Governmental Entities may be acting beyond the scope of any inherent or granted governmental authority in providing funds towards the Borrower's MRI in circumstances that would violate Handbook 4000.1, the National Housing Act, and is contrary to established law." Ex. A, at 2.  But HUD did not explain what the "scope of . . . governmental authority" is or how governmental entities are violating Handbook 4000.1, the NHA, or any other law.  Nor did HUD explain how the Mortgagee Letter prevents those purported unlawful

32

acts.  HUD has simply provided no reasoned explanation for the Mortgagee Letter and certainly has not identified a legitimate operational need or justification for issuing the Mortgagee Letter.

b.      Second, HUD thus failed to "display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.  And of course the agency must show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). HUD pretended that the new policy is an old policy.  Because it did not acknowledge the policy change, it gave no reasons to support it.  HUD has already been reprimanded once by the courts for failing to acknowledge a change of course in the area of DPA, *see Nehemiah Corp.*, 546 F. Supp. at 842, in a case that resulted in vacatur of the 2007 Rule.  The agency's pattern and practice of ignoring its own changes in policy is further evidence of its unlawful action.

c.      Third, HUD likewise did not acknowledge that its "longstanding policies may have 'engendered serious reliance interests that ***must*** be taken into account.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (emphasis added).  CBCMA has reasonably relied for years on HUD's policy and has provided DPA for ***thousands*** of mortgages as a result.  Yet HUD did not so much as acknowledge the possibility of affected reliance interests.  That is arbitrary and capricious.

33

**VII.** **HUD Violated The Constitution And The APA By Not Providing Fair Notice And By Engaging In A Regulatory Taking.**

72. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Yet that that is exactly what occurred here. HUD destroyed CBCMA's business virtually overnight without prior notice and without opportunity to comment on the new policy, despite knowing the consequences of its action. HUD knowingly and intentionally violated CBCMA's due process rights under the Fifth Amendment to the Constitution. A violation of constitutional rights also constitutes a violation of the APA.

73. Similarly, the fact that the "regulation . . . deprives [CBCMA's property] of all economically beneficial use" without compensation is a violation of the Fifth Amendment's Takings Clause. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992). Such "total deprivation of beneficial use is, from the []owner's point of view, the equivalent of a physical appropriation." *Id.* at 1017. As of this filing, the Mortgagee Letter has destroyed the lion's share of CBCMA's value as a going concern, and that detrimental impact will only continue absent relief from this Court; the company's remaining value rests purely in its existing loans and in its small conventional loan line of business. That uncompensated destruction of CBCMA's business is an unconstitutional taking and violates the APA.

74.   Separately, "[a] rule that has unreasonable secondary retroactivity—for example, altering future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule—may for that reason be 'arbitrary' or 'capricious,' *see* 5 U.S.C. § 706, and thus invalid." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring).  That is, the abrupt disruption to CBCMA's settled expectations is arbitrary and capricious even if it is not unconstitutional.

## VIII.  <u>As A Matter Of Law, HUD Cannot Require CBCMA To Operate Only On The Reservation Or To Serve Only Tribal Members.</u>

75.   HUD does not have statutory authority to keep CBCMA on the reservation.  Nor does it have the authority to restrict CBCMA to providing DPA only to tribal members.  The Mortgagee Letter violates the NHA and is in excess of statutory authority, not in accordance with law, and arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A), (C).

76.   HUD has no statutory authority to impose geographical or ethnicity-based limitations on Governmental Entities' provision of DPA.  "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014).  Here, Congress clearly has ***not*** authorized HUD to require states and other Governmental Entities to seek the permission of other jurisdictions before doing business within their borders.  The new requirements introduced by the Mortgagee Letter go directly to the relationships among the states, and among state

and tribal governments.  It is therefore an issue of vast economic and political significance, for which Congress has not delegated rulemaking power to HUD.

77.    Furthermore, only Congress has the power to regulate tribes directly, and it has not delegated to HUD the power to limit tribes' provision of DPA to borrowers based on their tribal membership or residence within tribal lands.  Where Congress has wanted HUD to create special rules for property on tribal lands or with regard to tribes or tribe members, it has done so clearly and in detail.  *See* 12 U.S.C. § 1715z-13(a) (allowing HUD to ignore "any limitation . . . that the Secretary determines is contrary to promoting the availability of [FHA] insurance on Indian reservations if" the mortgagor is a tribe or tribal member and the property is located on tribal land); *id.* § 1715z-13a (allowing HUD to guarantee principal and interest due on certain loans "made to an Indian family, Indian housing authority, or Indian tribe").  Rather than granting HUD the authority to regulate the revenue-raising activities of tribes, Congress has delegated authority over the scope of Section 17 corporations to DOI through the authority to issue corporate charters.  *See* 25 U.S.C. § 5124.  DOI granted CBC a charter that allowed it to do business throughout the United States and to create subsidiaries, such as CBCMA.  *See supra* ¶¶ 8–9.

78.    In fact, Congress has unambiguously expressed its intent that HUD should ***not*** attempt to regulate the state and tribal governments in this manner.  To begin, Section 203(b)(9)(A) does not prohibit the provision of DPA at all in the secondary mortgage market, the only market in which CBCMA operates.  Rather, Congress prohibited interested parties from providing DPA as part of the first, initial

36

mortgage—*i.e.*, the relevant "transaction" described in Section 203(b)(9)(A).  HUD itself recognized this in its final decision regarding the audit of Nova Financial & Investment Corporation.  *See* Ex. I, at 3.

79.     Moreover, nothing in the text of Section 203 of the NHA, which requires a downpayment for federally insured mortgages, permits HUD to impose limitations based on the geographical location of the lender.  12 U.S.C. § 1709.  To be sure, Congress authorized the provision of insurance "upon such terms as the Secretary may prescribe," *id.* § 1709(a), but that does not give HUD carte blanche. HUD may not condition insurance approval on lenders serving ham sandwiches for lunch.  Rather, the specific requirements set forth in the statute relate to risk and the mechanics of insurance.  A limitation or restriction based on the geographical location of the lender has no rational relation to the risk or mechanics of insurance— and HUD mentioned none in the Mortgagee Letter, which precludes the agency from relying on any *post hoc* rationalization it might dream up now.

80.     Congress has demonstrated that it knows how to limit Governmental Entities to their geographic boundaries, but it did not do so here.  *See, e.g.*, 42 U.S.C. § 12752(a) ("Each participating [local] jurisdiction shall . . . distribute assistance under this part geographically within its boundaries . . . ."); *id.* § 12752(b) ("Participating States shall be responsible for distributing assistance throughout the State according to the State's assessment of the geographical distribution of the housing need within the State . . . .").

81.     This understanding is confirmed by 12 U.S.C. § 1735f-6, which prohibits HUD from refusing to insure a mortgage "solely because" the collateral is subject to a secondary mortgage "made or insured, or . . . held, by any State or local governmental agency or instrumentality."   That is, while HUD may condition its provision of insurance on the basis of underwriting and other risk-based criteria (e.g., minimum applicant credit scores and debt-to-income ratios), it **cannot** refuse to insure a mortgage simply because it is provided by a governmental entity.   The Mortgagee Letter contains no explanation for its changes to settled regulation and certainly does not identify any legitimate justification for those changes.   The Mortgagee Letter thus exceeds HUD's statutory authority.

82.     The legislative history of § 1735f-6 corroborates that Congress contemplated that HUD might "withhold insurance for any other reason associated with normal underwriting standards."   H.R. Rep. 95-1161, at 43–44 (1978).   This section fulfills Congress's intent to allow FHA insurance of secondary financing by Governmental Entities "unless the secondary financing substantially increases the risk of loss to the Federal Government."   *Id.*   As discussed above, there is no risk-related rationale for limiting Governmental Entities' provision of DPA to properties within their geographical boundaries, and the Mortgagee Letter identifies none.

83.     Under the tribal canon of statutory interpretation, § 1735f-6 must be interpreted to cover tribal governments as well.   Federal courts, led by the Supreme Court, adhere to the "canon requiring resolution of ambiguities in favor of Indians"—a rule that "is to be given the broadest possible scope."   *NLRB v. Pueblo*

38

*of San Juan*, 276 F.3d 1186, 1194 (10th Cir. 2002) (en banc) (quotation marks omitted).  Courts "provide for a broad construction when the issue is whether Indian rights are reserved or established, and for a narrow construction when Indian rights are to be abrogated or limited."  *Id.* (quoting Felix Cohen, *Handbook of Federal Indian Law* 225 (1982)); *see also Pueblo of San Juan*, 276 F.3d at 1196 ("While this settled principle may find application in other types of cases, in matters of Indian law *expressio unius* [*est exclusion alterius*] must often be set aside. . . .  Silence as to tribes can constitute a latent or intrinsic ambiguity that only becomes apparent when other facts are considered. . . .  The correct presumption is that silence does not work a divestiture of tribal power." (quotation marks omitted)).  This canon has been applied to generally applicable statutes.

84.    Even if HUD had statutory authority under Section 203 of the NHA to prohibit **States** from providing cross-border DPA, the tribal canon requires interpreting the statute to allow **tribes** to provide this service to non-tribal members off the reservation.  Special care must be taken to interpret statutes' applicability to tribes, especially when tribal sovereignty is at issue.  "[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978); *see also Pueblo of San Juan*, 276 F.3d at 1192 (describing tribes' "inherent sovereignty" that cannot be limited unless and "[u]ntil Congress acts").

85.     HUD's policy change would immediately and uniquely harm CBCMA's sovereign power, derived and delegated from the Cedar Band, to raise revenue.  Raising revenue is a function of all sovereigns.  Money from CBCMA's activities benefits the Cedar Band and its members.  *See supra* ¶ 52.  Participating in the national economy is one way for tribes to raise revenue for the benefit of their members.  That is part of the reason why Congress authorized the creation of special tribal corporations under Section 17 of the Indian Reorganization Act, 25 U.S.C. § 5124.  The general rule is that "section 17 corporations retain their tribal status." *Breakthrough Mgmt. Grp. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 n.8 (10th Cir. 2010).  The DOI's Bureau of Indian Affairs must approve the charters of Section 17 corporations, and they can be revoked only by an act of Congress. 25 U.S.C. § 5124.  That is why HUD has long recognized (until now) that American Indian tribes and their Section 17 corporations, no less than state and local governments, act in a governmental capacity when they provide DPA both within and outside their territorial boundaries.

86.     Raising revenue through off-reservation business activities is especially important for small tribes such as the Cedar Band, which was relegated to a small, highly undesirable and largely unusable and non-arable land.  If the Cedar Band and its instrumentalities may only act in a governmental capacity within the borders of the reservation or when transacting with tribal members, as the Mortgagee Letter claims, the tribe would be effectively barricaded on the reservation, cut-off from the self-help that is its sovereign right.  In fact, DOI recognized this very fact by granting

40

a federal charter to CBC that allows it to operate throughout the United States. *See supra* ¶ 8.

87.     The Mortgagee Letter states that tribes are not acting within their "governmental capacity"—that tribes are "acting beyond the scope of any inherent or granted governmental authority"—by providing DPA outside their reservations and to non-members. Ex. A, at 2. But by raising much-needed revenue for the Cedar Band, CBCMA is acting entirely within the tribe's sovereign, governmental capacity.

88.     The Mortgagee Letter is thus inconsistent with federal policy toward American Indians that promotes tribal self-determination, self-sufficiency, and economic development—a policy that has been emphasized by the current Administration.   And the Mortgagee Letter is also inconsistent with Secretary Carson's statement that HUD should strive to "create ladders of opportunity so that people don't have to be dependent."  Susan Gonzalez, *Future HUD Secretary Ben Carson '73 Stresses Self-Sufficiency as Goal of Government Programs*, YaleNews (Dec. 9, 2016), https://news.yale.edu/2016/12/09/future-hud-secretary-ben-carson-73-stresses-self-sufficiency-goal-government-programs (Ex. J-9).

89.     Moreover, deeming tribal activities to be non-governmental is tantamount to deeming tribes to have waived sovereign immunity with respect to those activities.   However, "[t]o abrogate tribal immunity, Congress must 'unequivocally' express that purpose."  *C & L Enters., Inc. v. Citizen Band*

41

*Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001).  Congress has not unequivocally abrogated tribal sovereign immunity in this context.

90.     Furthermore, HUD did not have statutory authority to issue the Mortgagee Letter because it forces lenders to potentially violate the Fair Housing Act by requiring lenders to consider race in deciding whether to provide DPA.

91.     HUD has brought enforcement actions against lenders alleging violations of Sections 804(b) and 805(a) of the Fair Housing Act, 42 U.S.C. §§ 3604(b), 3605(a) in matters where the lenders allegedly subjected the borrowers to discrimination on the basis of race where the lender considered the location of the property, which was within the boundaries of an American Indian reservation, in denying a mortgage loan.  *See* HUD, Title VIII Conciliation Agreement, FHEO Title VIII Case No. 08-13-0299-8 (2014); Title VIII Conciliation Agreement, FHEO Title VIII Case Nos. 08-17-5267-8 and 08-6949-8 (2018).

92.     The Mortgagee Letter requires tribal lenders to consider the location of the property on an American Indian reservation, since it effectively limits such lenders to providing DPA within the geographic bounds of the reservation, and thus requires lenders to consider the very factor that HUD found discriminatory. Moreover, the Mortgagee Letter requires tribal lenders even more directly to consider the borrower's personal American Indian identity, as such lenders may only provide DPA outside the geographic bounds of the reservation if the borrower is an enrolled member of the tribe.  This means that where a borrower is seeking DPA on a property outside the bounds of a reservation, the provider must request and

42

consider the borrower's tribal status in order to determine whether it can make the loan. Significantly, the Mortgagee Letter prohibits lenders from providing DPA to members of a different tribe unless that members' property is located on the DPA provider's tribal land. Therefore, not only must DPA providers consider race directly, they must also consider the exact tribe of the borrower. Thus, according to the Mortgagee Letter, where a borrower is not a member of the provider's tribe, the provider must deny the DPA loan on the basis of that borrower's race and American Indian identity. HUD cannot claim authority under the NHA to require lenders to violate the Fair Housing Act.

93.     In addition, it is "settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *See Gomez v. United States*, 490 U.S. 858, 864 (1989). The Mortgagee Letter's geographic and ethnic limitations on CBCMA's ability to provide DPA raise troubling constitutional questions:

> a.     "First, the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that [the Supreme Court has] consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004). It would violate the separation of powers for an Executive Branch agency such as HUD to regulate tribal affairs without explicit congressional authorization. The irrevocability (absent an act of Congress) of Section 17 charters makes this issue starker in this context.

b.      Second, the Mortgagee Letter likely violates the equal protection principles enshrined in the Fifth Amendment by requiring tribes to provide DPA on the basis of the ethnic or racial identity of the borrower.

## IX.   The Mortgagee Letter Further Violates The APA.

94.     The Mortgagee Letter is unconstitutional, unlawful, and otherwise arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A)–(D).  That is so for all the reasons given above.  *See supra* ¶¶ 57–93.

95.     In addition, HUD's action is unlawful and otherwise arbitrary and capricious, 5 U.S.C. § 706(2)(A), for several other reasons:  because the Mortgagee Letter fundamentally conflicts with DOI's approval of the CBC charter, which allows it and its instrumentalities to engage in activities nationwide; because the Mortgagee Letter's implicit understanding of "governmental capacity" is fundamentally inconsistent with tribal sovereignty; because HUD did not consider the devastating effect its new rule will have on tribal self-sufficiency and economic development; because HUD did not consider the market need for the type of DPA that CBCMA provides, the heightened protections that CBCMA imposes to avoid creating excess risk for the FHA, such as minimum applicant credit scores and debt-to-income ratios, and CBCMA's excellent below average default rate, *see* Whipple Decl. ¶¶ 12; and because the Mortgagee Letter is based on a factor (governmental status) that Congress specifically prohibited HUD from relying on when regulating. *See supra* ¶¶ 77–89; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and

capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

## FIRST CLAIM FOR RELIEF

### Injunctive And Declaratory Relief:
### The Mortgagee Letter Must Be Set Aside Under The APA.

96.    Plaintiffs incorporate the preceding paragraphs by reference.

97.    The Mortgagee Letter is a legislative rule that was required to go through the APA's notice-and-comment procedure. 5 U.S.C. § 553(b)–(c). HUD's failure to do so violated the APA and requires vacatur of the Mortgagee Letter. 5 U.S.C. § 706(2)(A).

98.    HUD's enabling statute required it to provide Congress with notice of the rule before it was published for comment in the Federal Register. 42 U.S.C. § 3535(*o*). HUD's failure to do so violated the APA and requires vacatur of the Mortgagee Letter. 5 U.S.C. § 706(2)(A), (D).

99.    HUD was required by its own regulation to consult meaningfully with CBCMA about the Mortgagee Letter and to follow certain procedures before issuing it. *See* 81 Fed. Reg. 40893. HUD's failure to do so violated the APA and requires vacatur of the Mortgagee Letter. 5 U.S.C. § 706(2)(A), (D).

100.   HUD was required to provide a reasoned explanation for its decision to adopt the Mortgage Letter.  *State Farm*, 463 U.S. at 43.  HUD's failure to do so violated the APA and requires vacatur of the Mortgagee Letter.  5 U.S.C. § 706(2)(A).

101.   HUD was required to "display awareness that it *is* changing position" and "show that there are good reasons for the new policy."  *Fox Television*, 556 U.S. at 516.  HUD's failure to do so violated the APA and requires vacatur of the Mortgagee Letter.  5 U.S.C. § 706(2)(A).

102.   HUD was required to take into account the "serious reliance interests" engendered by the previous policy.  *Encino Motorcars*, 136 S. Ct. at 2126.  HUD's failure to do so violated the APA and requires vacatur of the Mortgagee Letter.  5 U.S.C. § 706(2)(A).

103.   HUD violated the Due Process Clause of the Fifth Amendment by not providing fair notice of its change in policy despite settled expectations relying on the previous policy.  *Landgraf*, 511 U.S. at 266.  By violating the Constitution, HUD also violated the APA, and the Mortgagee Letter must be vacated.  5 U.S.C. § 706(2)(A)–(B).

104.  HUD violated the Takings Clause of the Fifth Amendment by "depriv[ing] [CBCMA's property] of all economically beneficial use" without compensation.  *Lucas*, 505 U.S. at 1027.  By violating the Constitution, HUD also violated the APA, and the Mortgagee Letter must be vacated.  5 U.S.C. § 706(2)(A)–(B).

105.   The Mortgagee Letter "makes worthless substantial past investment incurred in reliance upon the prior rule." *Bowen*, 488 U.S. at 220.  That is arbitrary and capricious in violation of the APA, and thus the Mortgagee Letter must be vacated.  5 U.S.C. § 706(2)(A).

106.   As a matter of law, HUD lacked statutory authority to require CBCMA to operate only on the reservation or to serve only tribal members.  The Mortgagee Letter is thus unlawful and in excess of statutory jurisdiction, authority, or limitations, and thus the Mortgagee Letter must be vacated.  5 U.S.C. § 706(2)(A), (C).

107.   The Mortgagee Letter is arbitrary and capricious because it conflicts with DOI's approval of the CBC charter, which allows it and its instrumentalities to engage in activities nationwide.  It thus must be vacated.  5 U.S.C. § 706(2)(A).

108.   The Mortgagee Letter is arbitrary and capricious because it is fundamentally inconsistent with tribal sovereignty.  It thus must be vacated.  5 U.S.C. § 706(2)(A).

109.   The Mortgagee Letter is arbitrary and capricious because HUD did not consider the devastating effect its new rule will have on tribal self-sufficiency and economic development.  It thus must be vacated.  5 U.S.C. § 706(2)(A).

110.   The Mortgagee Letter is arbitrary and capricious because HUD did not consider the market need for the type of DPA that CBCMA provides, the heightened protections that CBCMA imposes to avoid creating excess risk for the FHA, such as minimum applicant credit scores and debt-to-income ratios, and CBCMA's

excellent below average default rate and pricing.  It thus must be vacated.  5 U.S.C. § 706(2)(A).

111.   The Mortgagee Letter is arbitrary and capricious because it is based on a factor that Congress did not intend HUD to consider.  It thus must be vacated.  5 U.S.C. § 706(2)(A).

112.   For each of the reasons in paragraphs 57–95, HUD's promulgation of the Mortgagee Letter violated the APA.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706.  The Mortgagee Letter should be declared unlawful and set aside, and Defendants and all persons acting in concert with them should be enjoined from enforcing, implementing, and giving the Mortgagee Letter effect in any manner.

## SECOND CLAIM FOR RELIEF

### Declaratory Relief:
### Declaratory Judgment Act.

113.   Plaintiffs incorporate the preceding paragraphs by reference.

114.   The Declaratory Judgment Act gives this Court the power to grant declaratory relief under 28 U.S.C. § 2201, and to grant further necessary and proper relief based on a declaratory judgment under 28 U.S.C. § 2202.

115.   An actual controversy within this Court's jurisdiction exists between the parties concerning the legal validity of the Mortgagee Letter.  A declaratory judgment is necessary and appropriate to resolve this dispute.

116.   As described in detail above, the Mortgagee Letter violates the NHA and the Due Process and Takings Clauses of the Fifth Amendment.

117.   The Mortgagee Letter has and will continue to irreparably harm Plaintiffs.  This controversy is thus of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

118.   A declaration that the Mortgagee Letter is unlawful and unconstitutional would serve a useful purpose in clarifying or settling a legal issue between the parties.

119.   A declaration that the Mortgagee Letter is unlawful and unconstitutional would finalize the controversy between the parties and offer them relief from uncertainty.

120.   Mortgagee Letter has caused and will continue to cause serious and irreparable harm to Plaintiffs.  Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining and enjoining Defendants and all persons acting in concert with them from enforcing, implementing, and giving the Mortgagee Letter effect in any manner.

121.   Plaintiffs are therefore entitled to relief pursuant to 28 U.S.C. §§ 2201, 2202.  The Mortgagee Letter should be declared unconstitutional, and unlawful under both the APA and the NHA.

### THIRD CLAIM FOR RELIEF

### Temporary Restraining Order And Preliminary Injunctive Relief.

122.   Plaintiffs incorporate the preceding paragraphs by reference.

123.   The Mortgagee Letter has and continues to cause irreparable injury to Plaintiffs in the form of threatening the existence of CBCMA, causing lender partners to cancel business, harming CBCMA's reputation and goodwill, and causing constitutional injury to Plaintiffs as alleged herein.

124.   Plaintiffs are likely to succeed on the merits of the claims asserted in this Complaint.

125.   The balance of harms weighs in Plaintiffs' favor, because while Plaintiffs are suffering irreparable injury, Defendants suffer no harm from the continued offering of DPA by Plaintiffs.  Moreover, injunctive relief is in the public interest because it will uphold reasonable reliance interests based on Defendants' previous policy, as well as ensure access to affordable housing for low-income and other disadvantaged individuals.

126.   Plaintiffs are therefore entitled to both a temporary restraining order, a preliminary injunction, and ultimately, a permanent injunction against Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.   Declare that the Mortgagee Letter violates the APA;

B.   Declare that the Mortgagee Letter violates the NHA;

C.   Declare that the Mortgagee Letter is unconstitutional;

D.   Vacate and set aside the Mortgagee Letter;

E.     Enter a temporary restraining order preventing Defendants and all persons acting in concert with them from enforcing, implementing, and giving the Mortgagee Letter effect in any manner;

F.     Enter a preliminary injunction preventing Defendants and all persons acting in concert with them from enforcing, implementing, and giving the Mortgagee Letter effect in any manner;

G.     Enter a permanent injunction preventing Defendants and all persons acting in concert with them from enforcing, implementing, and giving the Mortgagee Letter effect in any manner;

H.     Issuing all process necessary and appropriate to postpone the effective date of the Mortgagee Letter and exemptions and to maintain the status quo pending the conclusion of this case;

I.     Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

J.     Award such other relief as this Court may deem just and appropriate.

51

Dated: April 22, 2019                              Respectfully submitted.


                                                   s/ *Jeremy M. Christiansen*

Michelle L. Rogers                                 Helgi C. Walker
   (*pro hac vice* forthcoming)                       (*pro hac vice* forthcoming)
Veena Viswanatha                                   Lucas C. Townsend
   (*pro hac vice* forthcoming)                       (*pro hac vice* forthcoming)
Kathryn Goodman                                    Jeremy M. Christiansen (SBN 15110)
   (*pro hac vice* forthcoming)                    Andrew G. I. Kilberg
BUCKLEY LLP                                           (*pro hac vice* forthcoming)
1250 24th Street, N.W.                             GIBSON, DUNN & CRUTCHER LLP
Suite 700                                          1050 Connecticut Avenue, N.W.
Washington, D.C.  20037                            Washington, D.C.  20036
Phone:  (202) 349-8000                             Phone:  (202) 955-8500
Fax:  (202) 349-8080                               Fax:  (202) 467-0539
Email:  MRogers@buckleyfirm.com                    Email:  HWalker@gibsondunn.com
VViswanatha@buckleyfirm.com                        LTownsend@gibsondunn.com
KGoodman@buckleyfirm.com                           JChristiansen@gibsondunn.com
                                                   AKilberg@gibsondunn.com

                                                   Michael Flynn
                                                      (*pro hac vice* forthcoming)
                                                   GOODWIN PROCTER LLP
                                                   901 New York Avenue, N.W.
                                                   Washington, D.C.  20001
                                                   Phone: (202) 346-4000
                                                   Fax: (202) 346-4444
                                                   Email: Michaelflynn@goodwinlaw.com